**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

COLORADO CROSS-DISABILITY COALITION,
DAVID HOWELL,
CHRISTOPHER BROCK,
TOM MUÑIZ, and
GINA JUSTUS,

      Plaintiffs,

v.

CSL PLASMA, INC.,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

**NATURE OF THE ACTION**

1.      This is a challenge to Defendant CSL Plasma's blatant discrimination against people with various types of disabilities. Pursuant to CSL's discriminatory policies and practices, it excludes Plaintiffs David Howell, Christopher Brock, Tom Muñiz, and Gina Justus ("Individual Plaintiffs") and others with disabilities from donating plasma. It thus deprives them of much-needed money that otherwise would be available to them, as well as the opportunity to contribute to the country's plasma supply at a time of national crisis. The Individual Plaintiffs, along with the Colorado Cross-Disability Coalition ("CCDC"), bring this action under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181 *et seq.*, and the Colorado

Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-301 *et seq.*, to bar CSL from continuing to discriminate in this fashion and for other relief.

2.      As a matter of corporate policy, CSL requires its plasma donation centers to impose blanket exclusions for people with various disabilities. These blanket exclusions are not based on evidence that people with such disabilities actually are unfit to donate, or that their plasma does not meet applicable standards. Rather, the blanket exclusions are based on discriminatory stereotypes and a refusal to make the sort of basic accommodations for disability that businesses around the country are required to make every day. Such policies cannot pass muster under the ADA or CADA, and indeed CSL has never claimed otherwise. Instead, it continues to maintain that it need not comply with disability laws, despite binding case law in this circuit establishing that such discrimination is unlawful.

3.      For example:

   a. CSL refuses to serve Mr. Howell solely on the basis of his diagnosis of schizophrenia—and CSL's discriminatory assumption that anyone with schizophrenia might act irrationally and dangerously at any time. In fact, Mr. Howell's mental illness has been successfully controlled by medication for years, he has previously donated plasma successfully and without incident at CSL facilities, and he has never behaved irrationally or dangerously at CSL facilities. Yet CSL, as a matter of policy, *assumes* that people with schizophrenia and other conditions controlled by medication are experiencing symptoms consistent with them *not taking their medication.* Allowing Mr. Howell to donate plasma would not create any significant risk for anyone, and there is no other legitimate reason

for excluding Mr. Howell from CSL's services. CSL's discriminatory "assume someone is not taking their medications" policy excludes many people with disabilities in addition to Mr. Howell.

b. CSL refuses to serve Mr. Brock, who is a paraplegic wheelchair user and cannot stand on CSL's scale to be weighed. This should not be an insurmountable barrier; CSL could obtain wheelchair-accessible scales or take other reasonable steps to weigh wheelchair users at its facilities. Instead, CSL insists that Mr. Brock get weighed by his physician (who presumably would use the exact accessibility equipment that CSL refuses to acquire), and that he do so on the exact day he donates plasma. CSL thus places the burden on Mr. Brock to jump through unnecessary and burdensome hoops to accommodate CSL's rigid policies rather than itself making reasonable modifications to permit Mr. Brock access to its services. And this policy similarly excludes many others (including those who use wheelchairs or other mobility devices) who cannot stand on a scale but could otherwise provide needed plasma.

c. Mr. Muñiz has cerebral palsy. He uses a wheelchair and crutches for mobility. After going through CSL's intake and examination process—and being deemed otherwise eligible to donate—he found he needed assistance getting onto the donor bed CSL uses for plasma donation. Rather than offering such assistance—which it could easily provide, by doing as little as providing him a stepstool—CSL excluded him from donating. As a matter of corporate policy, CSL prohibits its employees from assisting anyone to get onto its donor beds, and explicitly bars

anyone who needs such assistance from its services. This policy, too, needlessly excludes many people with disabilities from CSL's services.

d.  Ms. Justus has a seizure disorder that is largely controlled by medicine. She uses a service dog, Apache, who is trained to alert her and others in the event that she is about to have a seizure. CSL told her the only service animals it allows are guide dogs for individuals with vision impairments, and so she could not bring Apache with her. The services Apache provides are important to Ms. Justus's safety, and so CSL's refusal to let her bring Apache effectively bars her from donating plasma. And CSL's broader refusal to allow any service animals other than guide dogs, regardless of what services they perform, in its facilities during the intake and screening process necessarily excludes many more people with disabilities.

4.  These Individual Plaintiffs' experiences are representative of the explicit discrimination that CSL regularly commits against many people with disabilities as a matter of corporate policy and practice. CSL operates plasma collection centers, at which members of the public can "donate" blood plasma—the plasma industry's preferred term for the transaction—in exchange for money. CSL imposes criteria that make many people with disabilities categorically ineligible because of their disabilities, without conducting any individual assessment of whether those disabilities actually make them unfit to participate in the plasma donation/extraction process.

5.  One of CSL's categorical exclusions, for example, covers anyone diagnosed with any mental illness that can cause psychosis if left untreated, including but not limited to schizophrenia. It does not matter to CSL if the mental illness has been successfully managed

4

with medication for years, as Mr. Howell's has. CSL does not contend that Mr. Howell's

medications make his plasma unsuitable. Rather, CSL excludes him because of blatant prejudice

and discriminatory attitude: it assumes that people with schizophrenia do *not* take their

medications and that the worst possible manifestation of their condition will occur. CSL admitted

to the Colorado Civil Rights Commission that it excluded Mr. Howell because CSL believed

that, without proper medication, he might suddenly think aliens were commanding him to rip the

needle out of his arm and become violent. It was irrelevant to CSL that Mr. Howell's own

history and current medical condition provided no basis for thinking this outlandish scenario

would occur.

6.      The exclusionary policies and practices that CSL applies to discriminate against

the other Individual Plaintiffs are no more defensible. There is no legitimate reason, for example,

that CSL refuses to obtain wheelchair-accessible scales (which are quite affordable for a billion-

dollar corporation) or use other means to weigh wheelchair users. That CSL instructed Mr. Brock

to get weighed by his doctor (who would need that very equipment) just demonstrates CSL's

refusal to take reasonable steps to ensure accessibility as every other public accommodation must

do under the ADA. Nor is there any legitimate reason for CSL to categorically refuse, as a matter

of company policy, to assist people with disabilities in getting onto its donor beds, or for it to

categorically bar all service animals but guide dogs. And none of the Individual Plaintiffs

presented issues that are remotely new or complicated; the Justice Department has issued

guidance explaining how a public accommodation should serve the needs of people with

disabilities in exactly these situations (i.e., how to weigh a wheelchair user, how to assist

someone in transferring to a bed, when a service animal must be permitted). CSL just refuses to carry out well-established duties for places of public accommodation.

7. None of these discriminatory policies are required to ensure that donors meet the essential requirements for donating plasma; none are necessary to prevent a direct threat to anyone's health. CSL could serve the Individual Plaintiffs and others with disabilities whom it currently excludes without incurring undue costs or changing its services in any fundamental way. CSL's unnecessary exclusion of countless people with disabilities—without ever making individualized determinations that they are unfit to donate or making the least bit of effort to accommodate their needs—is precisely the sort of unthinking discrimination that the ADA and CADA are meant to stop. And its discrimination categorically excludes large numbers of people with disabilities who are perfectly capable of providing needed plasma.

8. CSL and other plasma donation centers maintain they are not required to follow the ADA, unlike virtually every other commercial establishment open to the public. Indeed, CSL told Mr. Howell its lawyers had "found a loophole in the law" allowing it to ignore the ADA's clear requirements, and then it told the Colorado Civil Rights Commission that it was exempt from coverage under a state law that incorporates the ADA's coverage by references.

9. Astonishingly, CSL told Mr. Howell this—and acted accordingly, with respect to him and the other Individual Plaintiffs—even after the U.S. Court of Appeals for the Tenth Circuit (which controls interpretation of federal law in Colorado) squarely ruled that plasma donation centers *are* public accommodations that *do* have to follow the ADA (as well as, necessarily, the analogous provisions of CADA). That decision appears not to have changed

CSL's behavior in the slightest in the operation of its Colorado facilities. CSL's lawless conduct makes clear that the company will not comply unless judicially enjoined to do so.

10.     This is a moment when exclusion from plasma donation matters more than ever. In tough economic times, many people with disabilities will need quick cash in the coming months, exactly the service that CSL is providing everyone else. And as CSL's own website pronounces, plasma donation can make people feel they are doing a public service during the COVID-19 crisis. Yet CSL denies many people with disabilities both the opportunity to make a buck and the opportunity to make a difference.

11.     CSL's blatant discrimination harms many members of CCDC, a Colorado nonprofit organization that seeks to ensure social justice for people with all types of disabilities. On behalf of its members—including but not limited to the Individual Plaintiffs here—CCDC seeks declaratory and injunctive relief to require CSL, at long last, to follow binding Tenth Circuit law and revise its policies and practices to conform with the ADA and CADA. It is past time for CSL to stop excluding people with disabilities from its services without any legitimate basis for doing so.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over Plaintiffs' Americans with Disabilities Act claims pursuant to 28 U.S.C. §§ 1331, 1343 and 2201. It has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a).

13.     Venue is proper in this District and division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

District and division and because the Defendant conducts its business in this District and division.

## PARTIES

14.     Plaintiff David Howell is a 36-year-old man who has been diagnosed with schizophrenia, a mental-health impairment that substantially limits a major life activity. He resides with his wife in Littleton, a city in Arapahoe County, Colorado. At all times material to this Complaint, Mr. Howell has been a resident of the state of Colorado. Mr. Howell is a member of CCDC.

15.     Plaintiff Christopher Brock is a 35-year-old man who is a paraplegic as the result of a spinal cord injury, resulting in a substantial limitation in a major life activity. He resides with his wife in Aurora, a city in Arapahoe County, Colorado. At all times material to this Complaint, Mr. Brock has been a resident of the state of Colorado. Mr. Brock is a member of CCDC.

16.     Plaintiff Tom Muñiz is a 48-year-old man who has cerebral palsy, an impairment that substantially limits a major life activity. He resides in Greeley, a city in Weld County, Colorado. At all times material to this Complaint, Mr. Muñiz has been a resident of the state of Colorado. Mr. Muñiz is a member of CCDC.

17.     Plaintiff Gina Justus is a 55-year-old woman who has a seizure disorder that substantially limits a major life activity and requires her to be accompanied by her service dog in order to ensure her safety. She resides in Grand Junction, a city in Mesa County, Colorado. At all times material to this Complaint, Ms. Justus has been a resident of the state of Colorado. Ms. Justus is a member of CCDC.

18.     Plaintiff Colorado Cross-Disability Coalition is a non-profit corporation organized pursuant to Section 501(c)(3) of the Internal Revenue Code. Formed in 1990 for the purposes of ensuring the ADA's promises would be realized in Colorado, CCDC is a statewide membership organization with principal offices located in Denver County and affiliated groups throughout the state. CCDC's mission is to advocate for social justice for people with all types of disabilities.

19.     Defendant CSL Plasma, Inc., is a corporation incorporated in Delaware and headquartered in Boca Raton, Florida. It is a subsidiary of CSL Behring, a corporation headquartered in King of Prussia, Pennsylvania, which in turn is a subsidiary of CSL Limited, a multinational corporation headquartered in Melbourne, Australia. CSL Plasma operates one of the largest plasma collection networks in the United States, where it has more than 200 plasma collection centers.

20.     CSL Plasma conducts and transacts business in the state of Colorado. It has seven plasma collection centers in Colorado, including the centers that excluded the Individual Plaintiffs in Aurora, Evans, and Grand Junction. CSL is registered to receive service of process at 7700 E. Arapahoe Rd., Ste. 220, Centennial, CO 80112-1268.

## FACTUAL BACKGROUND

### *CSL's Plasma Collection Practices and People with Disabilities*

21.     Plasma collection centers are commercial establishments that extract blood plasma—the fluid portion of human blood—from members of the public in exchange for payment. They constitute an enormous and rapidly growing industry in the United States.

22.     More than 700 plasma collection centers exist in the United States, which is by far the world's largest plasma exporter. These centers collectively accept more than 40 million

plasma donations annually, generating revenue of more than $20 billion. CSL Plasma operates

more than 200 of these centers, and it continues to expand rapidly.

23.     At its plasma donation centers, CSL requires members of the public to sit or lie in

a donor bed, where they are connected to specialized machinery. That machinery draws blood

from the donor, separates the plasma from the blood cells, and reinjects the blood cells back into

the donor, in a process called plasmapheresis.

24.     At the end of this process, CSL compensates the donor, usually providing an

amount on the order of $50.

25.     According to the CSL website, a donor "can get paid up to $400 each month by

donating life-saving plasma."

26.     CSL uses the blood plasma collected as the raw material for various

pharmaceutical products. CSL Limited is a vertically integrated, multi-national enterprise; CSL

Plasma's function within the enterprise is to extract plasma from the public for money, while

other parts of the enterprise turn the plasma into products that can be sold for many times more.

27.     CSL invites all members of the public into its facilities, but it excludes some from

fully participating in its services. People who wish to donate plasma complete a screening

process that includes various tests and questionnaires, a medical history, and a limited physical

examination that includes checks of temperature, blood pressure, and weight.

28.     CSL employees employ CSL's Medical Staff Reference (MSR) to determine

which people will be deemed unfit to donate. In some respects, the MSR fulfills CSL's duties

pursuant to Food and Drug Administration (FDA) regulations, which obligate plasma collection

centers to ensure donors meet specified health criteria. *See* 21 C.F.R. § 640.31; 21 C.F.R. §

630.10. In particular, FDA regulations require that a "donor must be in good health and free from transfusion-transmitted infections," 21 C.F.R. § 630.10(a), and that a plasma center must perform specified physical assessments to ensure these criteria are met. *See, e.g.*, 21 C.F.R. § 630.10(f) (specifying body temperature, blood pressure, and hemoglobin levels that make prospective donors ineligible). In accordance with these regulations, CSL "defers" prospective donors who do not meet these regulatory criteria, *i.e.*, it excludes them until such time as they meet these standards and become eligible.

29.     CSL does not stop there, however. Through its MSR, CSL excludes donors for reasons that go far beyond any requirement imposed by FDA regulations, imposing eligibility criteria that are not essential to the task of donating plasma and are discriminatory against people with disabilities. For instance, it calls for the categorical exclusion of people with a variety of disabilities, without regard to whether any particular individual presents any real risk.

30.     Among those categorically excluded are people with a variety of diagnosed mental illnesses, even if well controlled by medication; people with diabetes who require insulin; individuals who cannot stand on a scale; individuals who cannot transfer to donor beds without assistance (including both those who could readily transfer with assistance and those who could provide plasma donations from wheelchairs without transferring to donor beds); and many individuals who require the assistance of service animals. CSL labels these as "deferrals," but in truth they are permanent exclusions with respect to people who have disabilities that will continue indefinitely (even when symptoms can be controlled).

31.     CSL expressly forbids its staff from making individualized determinations as to whether letting particular individuals with disabilities donate plasma would actually present

whatever risks CSL imagines exist. It similarly forbids its staff from modifying its rigid rules to accommodate the needs of individuals with disabilities. Perversely, where individuals with disabilities have developed means of controlling their symptoms, rather than taking these effective remedies into account as a reason to *include* people, CSL often uses them as a reason to *exclude* people. For example, CSL might permit someone with a disability that is controlled by a service animal to donate if that person presents *without* the service animal, but not if she presents *with* the service animal.

32.     Thus, CSL as a matter of stated policy engages in the sort of overbroad exclusion of people with disabilities—and refusal to make basic accommodations to ensure their access— that Title III of the ADA makes unlawful for virtually every commercial establishment open to the public. Title III is intended "to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities." S. Rep. No. 101-116, at 55 (1989). Its animating principle is that places of public accommodation must "make decisions based on facts applicable to individuals and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do." *Id.*; *see also* 28 C.F.R. § 36.301(b) ("[s]afety requirements must be based on actual risks and not on speculation, stereotypes or generalizations about individuals with disabilities"). Yet CSL is doing the opposite; it excludes people based on irrebuttable and unsupported presumptions and stereotypes about classes of people rather than individual assessments.

33.     Plasma companies, including CSL, have maintained in other litigation in this circuit and elsewhere that they are permitted to engage in such broad, overt disability

discrimination because they are not subject to Title III and analogous state laws. However, in a holding that is binding on plasma centers in Colorado, the Tenth Circuit ruled otherwise in 2016. *See Levorsen v. Octapharma*, 828 F.3d 1227 (10th Cir. 2016). *Levorsen* held that plasma donation centers are public accommodations subject to Title III. *Id*. at 1231-35. It did so with respect to allegations very similar to those asserted by Mr. Howell. The plasma donation center in that case, like CSL here, excluded a plaintiff with schizophrenia based only on his diagnosis, without regard to whether the concerns that prompted that exclusion were valid with respect to him. *Id*. at 1229-30.

34.     In *Levorsen*, the Tenth Circuit rejected a plasma company's assertion that FDA regulation of the plasma industry justified its position, holding that the defendant could not rely on FDA regulations to justify discrimination unless a specific FDA regulation actually required the exclusion at issue. *Id.* at 1245, n.9. The FDA filed a brief in that case agreeing that its regulations did not require, and could not justify, the industry's rampant disability discrimination. *Id.*

35.     All the allegations of discrimination described below took place *after Levorsen*, and yet CSL remains steadfast in its position that the disability laws do not pertain to its activities, and, therefore, it may discriminate against people with disabilities in any way it wishes.

<u>*CSL's Discrimination Against Mr. Howell*</u>

36.     Mr. Howell was diagnosed at the age of 18 with schizophrenia. For many years, he has successfully managed this condition with medications, primarily Abilify and Geodon.

37.     While on those medications, between 2011 and 2014, Mr. Howell donated plasma, without incident, at least 13 times at CSL's Aurora facility. Each time, he completed CSL's standard questionnaire.

38.     Between 2014 and 2018, Mr. Howell did not attempt to donate plasma.

39.     On May 23, 2018—almost two years after *Levorsen* held that Title III of the ADA applied to plasma donation centers—Mr. Howell visited CSL's Aurora facility, intending to donate plasma and to receive compensation for doing so.

40.     Mr. Howell completed the standard medical questionnaire and medical screening. He was asked if he took medication, and he voluntarily disclosed that he did. When asked which medications he takes, Mr. Howell disclosed that he takes Abilify and Geodon; when asked what diagnosed condition necessitated those medications, he disclosed that he has been diagnosed with schizophrenia.

41.     Throughout this two-hour process (including wait time), Mr. Howell remained stable and calm. He did not in any way present as someone who was unfit to donate plasma.

42.     Based on this information alone, a CSL staff member determined that Mr. Howell was ineligible to donate. The staff member told Mr. Howell that this determination was based on the MSR, which requires deferring anyone with diagnosed schizophrenia that requires medication, without regard to present symptoms. Mr. Howell told the staff member he had donated in the past while diagnosed with schizophrenia and while on the same medication, but this information was irrelevant to CSL's rigid policy.

43.     Mr. Howell questioned how this exclusion could be legal. The staff member—two years after the Tenth Circuit's decision in *Levorsen*—informed him that "our lawyers have found a loophole in the law."

44.     Mr. Howell immediately filed a complaint with the Colorado Civil Rights Commission.

45.     In its response to the Commission, CSL principally argued that the Commission had no jurisdiction to hear Mr. Howell's complaint because FDA regulations preempted any state regulation of its deferral decisions, without acknowledging *Levorsen*, which foreclosed this argument in Colorado. Neither in its submissions to the Commission or in its explanation to Mr. Howell did CSL point to any specific FDA regulation that justified its actions with respect to Mr. Howell. Nor could it have done so.

46.     But in support of its position before the Commission, CSL did submit a two-page statement from center medical director Suzanne Bertram. She stated that the MSR requires CSL medical staff to refer to an entry for "psychosis" when screening a potential donor with schizophrenia. That entry, in turn, makes individuals ineligible to donate unless the "psychosis" is "due to a reversible condition or a single episode and now resolved." Schizophrenia, she stated, can never meet these criteria, and so anyone diagnosed with schizophrenia can never be eligible to donate.

47.     Bertram explained that CSL imposes this categorical restriction because, in its view, it cannot ensure that people with schizophrenia "reliably take their medications" and maintain therapeutic medication levels. If a donor with schizophrenia did not maintain therapeutic medication levels, she stated, he "may perceive the needle in his arm to be a direct

line through which an evil alien is injecting him with dangerous spirits" and "the voices he hears may direct him to yank the needle out of his arm" and become violent.

48.     Bertram noted that people with diabetes requiring insulin also are categorically excluded, presumably based on how dangerous it would be for them to donate *without* taking their insulin.

49.     Although it termed its exclusion a "medical decision" with respect to Mr. Howell, CSL did not try to justify its decision based on any medical finding or judgment specific to Mr. Howell. Rather, it relied only on its rigid policy of categorically excluding all prospective donors with schizophrenia or other "psychosis." It did not acknowledge *Levorsen*'s holding that this was insufficient to justify discrination based on disability.

50.     CSL's stated concerns are unfounded as applied to Mr. Howell. Mr. Howell has assiduously followed his prescribed regimen of drugs for years. There is no significant risk that he would have the sort of dangerous delusions, or engage in the sort of dangerous behavior, that CSL ascribes to him. Yet CSL applied to him—and everyone else with schizophrenia—an irrebuttable presumption of dangerousness.

51.     The Commission issued a determination, finding that Mr. Howell had shown probable cause to believe discrimination had occurred. It found that CSL had presented insufficient evidence that Mr. Howell "displayed concerning behaviors or that his disability was symptomatic of a medical risk that would prevent him from safely going through the donation process."

52.     The Commission attempted, unsuccessfully, to conciliate the dispute, and then dismissed Mr. Howell's case without prosecuting it.

53.     Mr. Howell would have donated plasma multiple times in the past two years if not for CSL's discriminatory policies. If CSL is enjoined from continuing to discriminate against him, Mr. Howell intends to donate plasma at CSL's facilities.

### CSL's Discrimination Against Mr. Brock

54.     At all times material hereto, Mr. Brock was a resident of the state of Colorado.

55.     Mr. Brock is a paraplegic as the result of a spinal cord injury. He uses a wheelchair.

56.     In 2017 or 2018, Mr. Brock attempted to donate plasma at the Aurora, Colorado CSL facility, which was very close to his home.

57.     CSL staff told Mr. Brock that he had to be weighed at the CSL facility to donate plasma. CSL staff further informed him that, because he could not stand on CSL's scale, he could not be weighed and thus was not permitted to donate plasma.

58.     Mr. Brock can use an accessible scale and has done so in the past. CSL did not, however, provide him with an accessible scale or any other means by which he could be weighed at the CSL facility.

59.     CSL's refusal to provide any accessible means of weighing wheelchair users continues to this day. On April 20, 2020, Mr. Brock called the Aurora CSL facility and inquired as to the plasma donation requirements. He explained that he was a paraplegic. After consulting with someone else, a CSL employee asked if Mr. Brock could safely transfer from his wheelchair to the donor bed. Mr. Brock responded that he could do that without any problem, but—because of his previous experience—volunterered that he could not stand up to get

weighed. The CSL employee said it might be possible to get a roll-on scale sent to their location and said someone from the medical staff would call Mr. Brock to discuss further.

60.     Later that same day, Mr. Brock received a telephone call from the same CSL employee to whom he spoke earlier. The employee informed Mr. Brock that an accessible scale was not an available option and that he could not get weighed at the Aurora facility. Instead, he would have to get weighed at his doctor's office and have his doctor certify his weight. Moreover, he would have to be weighed by his doctor on the same day that he later donated plasma.

61.     This requirement that CSL imposed on Mr. Brock—that he make a doctor's appointment solely for the purpose of being weighed, and have that appointment take place just before he donates plasma—creates a major barrier to his accessing CSL's services that people without disabilities do not face. Other people can receive the roughly $40 that CSL pays simply by showing up, unannounced, for a couple of hours. Indeed, CSL Plasma's website states, "You'll be happy to know that appointments are not necessary." Frequently Asked Questions, https://www.cslplasma.com/faqs (response to Frequently Asked Question "Do I need to make an appointment to donate plasma?") (last visited Apr. 29, 2020). By contrast, Mr. Brock would have to dedicate his entire day to the enterprise, and plan that day well in advance—even assuming he could find a physician willing to make an appointment for no reason other than weighing him for purposes of plasma donation. CSL's policies are depriving Mr. Brock of the equal enjoyment of its services.

62.     CSL could readily provide Mr. Brock with equal enjoyment of its services, but it refuses to make the reasonable modifications to its policies that would make that possible.

63.     For example, CSL could provide scales that allow people to roll onto them, or it could employ other methods for obtaining the weight of individuals who cannot stand on a scale. Indeed, CSL's policy seems to contemplate that Mr. Brock's doctor will provide the very accommodations that CSL refuses to provide.

64.     These are not complicated, novel, especially costly, or otherwise unreasonable accommodations. Indeed, the Department of Justice provides public guidance on accessible scales and other methods for weighing patients, as well as the necessary staff training. *See* Dep't of Justice & Dep't of Health and Human Serv., *Americans with Disabilities Act Access to Medical Care for Individuals with Mobility Disabilities* (July 2010), https://www.hhs.gov/sites/default/files/ocr/civilrights/understanding/disability/adamobilityimpair mentsgudiance.pdf ("Mobility Disabilities Guidance") (last visited Apr. 24, 2020).

65.     If not for CSL's refusal to take the steps necessary to weigh him, it would have no reason to exclude Mr. Brock from donating. Mr. Brock is in excellent health, is very athletic, and participates in numerous sporting activities, including wheelchair lacrosse and cross-fit training.

66.     Mr. Brock would have donated plasma in the last two years if not for CSL's refusal to make its services accessible to him. If CSL is enjoined to make the necessary accommodations, Mr. Brock intends to donate plasma in the future.

### *CSL's Discrimination Against Mr. Muñiz*

67.     Mr. Muñiz has cerebral palsy and is substantially limited in the major life activity of walking. He uses a wheelchair and can ambulate some by using crutches.

68.     Approximately three years ago, Mr. Muñiz went to the CSL donation center in Evans, Colorado. Mr. Muñiz completed the CSL intake process, including completing all paperwork and answering all questions.

69.     Using his arm crutches, Mr. Muñiz was able to use the scale to get his weight.

70.     However, Mr. Muñiz then was asked to get onto the donor bed. He was unable to transfer to the donor bed using his crutches, and he asked for assistance. CSL staff informed Mr. Muñiz that they were not allowed to help people get onto the table. Mr. Muñiz asked for a stepstool. CSL staff informed him they did not have a stepstool and would not be allowed to provide him with one even if they had one.

71.     Mr. Muñiz was prevented from donating plasma by CSL solely because of his disability and the failure of CSL staff to accommodate his disability in any way.

72.     As a matter of policy, CSL refuses to provide any assistance to any individual getting on or off the donor bed. That is, it has a policy not to provide the very modifications that many people with disabilities need to access its services.

73.     On April 20, 2020, Mr. Muñiz called the Evans CSL facility to confirm that the policy that excluded him was still in place. He volunteered that he used crutches and would need some assistance to get on the donor bed. A CSL employee confirmed over the phone that employees are not permitted to provide any assistance getting on the donor bed.

74.     CSL could readily provide Mr. Muñiz with the necessary modifications at very little expense and without altering its services in any meaningful way. Indeed, as Mr. Muñiz himself suggested, it might have to do as little as provide him with a stepstool.

75.     Providing Mr. Muñiz with the assistance he needs to get on the donor bed would not cause a direct threat to the health or safety of anyone.

76.     This is not a novel issue. The Justice Department has provided guidance explaining that public accommodations should  assist people with disabilities in transferring to beds and explaining how to do it. *See, e.g.,* Mobility Disabilities Guidance at 2 (in the absence of accessible medical equipment, facilities should "have enough trained staff available who can assist the patient to transfer[;]"); *id*. at 11 (providing several suggestions for simple methods for assisting someone with transferring to an exam table, such as a gait belt, sliding board, a sheet or a "steady hand").

77.     There is no obvious justification for CSL's insistence that it will not aid a customer in any way to get onto the donor bed. The ability to get on a donor bed unassisted is not one of the essential criteria for donating plasma, under the FDA regulations or otherwise.

78.     And even if, for some unexplained reason, CSL could not reasonably assist people to get onto its raised donor beds, it could simply allow some people not to get onto the beds at all. Nothing about the donor bed itself is essential to the plasmapheresis process. CSL has not explained why an individual who uses a wheelchair cannot donate plasma while seated in the wheelchair, particularly when using wheelchairs that tilt or recline.

79.     Mr. Muñiz is otherwise eligible to donate plasma, as evidenced by the fact that he passed CSL's screening.

80.     Had he been permitted to donate plasma on that earlier occasion, Mr. Muñiz would have returned subsequently to donate plasma within the last two years. Because CSL

made clear that he would not be permitted to donate, Mr. Muñiz has not made the futile gesture of attempting to return.

81.     Mr. Muñiz intends to donate plasma if CSL will provide a reasonable accommodation and assist him with using the donor bed or otherwise provide him access to its services.

82.     Mr. Muñiz wants to donate plasma for the purpose of earning additional income as well as helping others who need plasma.

### *CSL's Discrimination Against Ms. Justus*

83.     Ms. Justus has a seizure disorder that substantially limits her major life activities.

84.     Ms. Justus's seizures are largely controlled by medication. She continues to have seizures sporadically.

85.     In order to ensure her safety in the event that she does have a seizure, Ms. Justus uses a service dog, "Rhino, the Apache Warrior Dog." Ms. Justus refers to him as "Apache." Apache has been trained to alert Ms. Justus and others when she is about to have a seizure. Apache has also been trained to use Ms. Justus's emergency call button to contact medical assistance when Ms. Justus begins to exhibit seizure-like behaviors.

86.     On April 20, 2020, Ms. Justus contacted the Grand Junction, Colorado, CSL Plasma donation center by phone to inquire about donating plasma.

87.     During that telephone call, Ms. Justus disclosed that she used a service animal.

88.     The CSL employee asked Ms. Justus if the service animal was an "eye-seeing dog," presumably referring to a guide dog for people who have visual impairments.

89.     When Ms. Justus said that was not what her dog was for, the CSL employee stated that the only type of service animal allowed at the facility was a guide dog for people with visual impairments.

90.     The CSL employee made clear that no other type of service animal would be allowed to accompany a CSL customer.

91.     About two weeks later, Ms. Justus again contacted the Grand Junction CSL donation center. She once again said she needed to bring a trained service dog that was not for a visual impairment. The employee who answered the phone put her on hold for about fifteen minutes to verify the company's policy, then told her once again she could not bring Apache with her.

92.     Ms. Justus's disability requires her service animal to be with her at all times to ensure her safety. CSL's policy of excluding her service animal effectively prevents her from donating plasma on the basis of her disability.

93.     CSL has no legitimate reason for excluding Ms. Justus's highly trained service animal. Service animals provide many types of necessary services for people with disabilities, not just guide dog duty. They routinely accompany people to other places of public accommodations, including doctor's offices, without incident. The obligation for places of public accommodation to permit them is well-established, including in authoritative DOJ guidance. *See, e.g.,* Dep't of Justice, *ADA Requirements Service Animals* 1 (Feb. 2020), https://www.ada.gov/service_animals_2010.htm (place of public accommodation "must permit service animals to accompany people with disabilities in all areas where members of the public are allowed to go") (last visited Apr. 26, 2020); *see also* U.S. Dep't of Justice, *Frequently Asked*

*Questions about Service Animals and the ADA* (July 2015),

https://www.ada.gov/regs2010/service_animal_qa.pdf).

94.     Based on its own statement of its policy, CSL is excluding service animals

broadly. This discriminatory policy impacts all individuals with disabilities who use service

animals.

95.     Ms. Justus is otherwise eligible to donate plasma. Her seizure disorder, when

controlled by medication and Apache, creates no significant risk that allowing her to donate

would pose a direct threat to anyone's health.

96.     Ms. Justus is a registered nurse and nurse practitioner. She is very cognizant of

avoiding activities that could present an actual threat to her health or the health of others in the

event she had a seizure while doing them. Donating plasma is not among those activities.

97.     Ms. Justus intends to donate plasma at a CSL plasma center, and be compensated

for doing so, if CSL removes or modifies its policy regarding service animals.

### *CSL's Discrimination Against CCDC Members*

98.     CCDC is a nonprofit, membership organization with the mission of ensuring

social justice for people with all types of disabilities, including but not limited to the disabilities

of the Individual Plaintiffs described above. The interests CCDC seeks to protect in this lawsuit

are germane to its purpose. Indeed, some of the provisions of the CADA that CCDC sues under

were amended to take their present form pursuant to the efforts of CCDC and its members.

99.     Unlike the Individual Plaintiffs, CCDC does not seek damages. It seeks

declaratory and injunctive relief on behalf of its members with varied disabilities.

100.     Each of the Individual Plaintiffs is a CCDC member.

101.     Each of the Individual Plaintiffs has standing to sue in his or her own right.

102.     CSL's policy of refusing to follow Title III of the ADA and the CADA actually or potentially injures many of CCDC's members, including but not limited to the Individual Plaintiffs. Many CCDC members are currently excluded by the specific policies that CSL applied to exclude the Individual Plaintiffs, and many more are at risk of injury by CSL's broader policy of refusing to follow Title III and the CADA.

103.     Neither the claims that CCDC asserts in this case nor the purely declaratory and injunctive relief it requests requires the participation of all CCDC members who would benefit from such relief.

### INJURY TO PLAINTIFFS

104.     As a direct and proximate result of CSL's discriminatory policies and practices described above, the Individual Plaintiffs have suffered, and continue to suffer, irreparable loss and injury, including, but not limited to, humiliation, emotional distress, and economic loss that may not be compensable later under Title III of the ADA.

105.     In addition, CSL has deprived the Individual Plaintiffs of the opportunity to partake in a service that could provide them with dependable, regular income.

106.     If not for CSL's discriminatory exclusion, the Individual Plaintiffs would have used CSL's services.

107.     Individual plaintiffs have suffered actual monetary damages under the CADA as a result of CSL's discriminatory policies.

108.     The Individual Plaintiffs intend to avail themselves of CSL's services as soon as CSL's discriminatory policies that exclude them are removed. They currently are not attempting

to donate plasma with CSL only because they know CSL has policies that exclude them and they see no reason to continue making futile efforts to donate.

109.    The Individual Plaintiffs are suffering continuing injuries that reoccur every day they are excluded from CSL's service.

110.    CSL's treatment of Individual Plaintiffs was in accordance with company policies, practices and procedures requiring its centers around the country to exclude people with certain disabilities without assessing their fitness to donate plasma as individuals. There is no way for people like the Individual Plaintiffs to become "eligible" to donate at CSL's facilities, no matter how fit they may be.

111.    CSL's discriminatory policies with respect to disabilities similarly hurt many other unnamed CCDC members. CCDC's members, who are individuals with a variety of disabilities along with their friends, family members and allies, all would benefit from ending CSL's discriminatory practices. The specific exclusions that the Individual Plaintiffs encountered also exclude many other CCDC members from the ability to donate plasma. And CSL's broader refusal to comply with Title III of the ADA necessarily excludes a wide variety of other CCDC members with disabilities, such as deaf members who require American Sign Language interpreters.

112.    Being excluded from plasma donation—and the accompanying compensation—is particularly damaging for people with disabilities, who disproportionately live in poverty. According to the National Council on Disability, an independent federal agency charged with advising the President, Congress and other federal agencies regarding policies, programs, practices and procedures that affect people with disabilities, "[p]eople with disabilities make up

approximately 12 percent of the U.S. working-age population; however, they account for more than half of those living in long-term poverty." Nat'l Council on Disability, "Highlighting Disability/Poverty Connection, NCD Urges Congress to Alter Federal Policies that Disadvantage People with Disabilities," (Oct. 26, 2017), https://ncd.gov/newsroom/2017/disability-poverty-connection-2017-progress-report-release (last visited Apr. 29, 2020).

113.    Exclusion from plasma donation also deprives the Individual Plaintiffs and other CCDC members of the opportunity to make a difference in combatting the current COVID-19 crisis.

114.    The CSL website states the following, "Save and Improve Lives[:] Your plasma donation can save and improve lives, plain and simple. And donating plasma is good for you, too, because you'll be compensated for your time, and leave with the knowledge that you're making a real difference in someone else's life." *See* Donation Benefits, https://www.cslplasma.com/why-donate (last visited Apr. 26, 2020). Furthermore, the CSL website claims, "Your plasma donations are needed more than ever!" *See* Find a Donation Center, https://www.cslplasma.com/center/co (last visited Apr. 26, 2020).

115.    According to the U.S. Food & Drug Administration ("FDA"), plasma donations may be helpful to patients currently fighting the current COVID-19 infection, particularly donations from those who have fully recovered from COVID-19. *See* U.S. Food & Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/donate-covid-19-plasma ("Donate COVID-19 Plasma"). Yet CSL's blanket exclusion of people with various disabilities—for reasons that have nothing to do with

the quality of their plasma, and that have no other legitimate reason—precludes CCDC members from taking part in this effort.

116.     Unless enjoined, CSL and its agents will continue to engage in unlawful discrimination, with the purpose and effect of preventing the Individual Plaintiffs, CCDC members, and others from enjoying their ADA and CADA rights. CSL has demonstrated through its actions that it will not follow even binding law of this circuit without judicial intervention. The actions described here happened *after* the Tenth Circuit found that Title III of the ADA applies to plasma donation centers.

## CAUSES OF ACTION

## COUNT ONE

**Violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189**

117.     Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

118.     CSL's plasma donation centers are places of public accommodation subject to the anti-discrimination requirements of Title III of the ADA. 42 U.S.C. § 12181(F); *see also Levorsen*, *supra*. Title III makes it unlawful for any individual to "be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Yet CSL is denying the Individual Plaintiffs and other CCDC members the full and equal enjoyment of its services on the basis of disability.

119.     CSL has made clear to each of the Individual Plaintiffs that CSL will not allow them to donate plasma because of their disabilities. Moreover, it has made clear that it does not

consider itself bound by Title III's requirements, and thus any person with a disability has no guarantee of lawful treatment when visiting a CSL facility. All CCDC members thus are harmed by CSL's unlawful policies.

120.   In addition to violating Title III's general non-discrimination requirement, CSL is violating many of the more specific provisions of Title III and its implementing regulations. It does so in a variety of ways, including but not limited to by:

 a. Denying people with disabilities the opportunity to participate in or benefit from its services, requiring that people with disabilities participate in an unequal benefit or a separate benefit. 42 U.S.C. § 12182(b)(1)(A)(i), (ii), (iii); 28 C.F.R. § 36.202(a), (b);

 b. Using standards, criteria, and methods of discrimination that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(D)(i); 28 C.F.R. § 36.204;

 c. Imposing unnecessarily eligibility criteria that screen out or tend to screen out individuals with disabilities from full and equal enjoyment of its services. 42 U.S.C. § 12182(b)(2)(A)(i); 28 C.F.R. § 36.301(a);

 d. Failing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford the goods, services, facilities, privileges, advantages, or accommodation to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302.

## COUNT TWO

**Violation of Colorado Anti-Discrimination Act, Colo. Rev. Stat. §§ 24-34-301(5.3); 24-34-601-602(1)(b), (3); 24-34-801-804.**

121.    Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

122.    CSL's plasma collection centers are "place[s] of public accommodation" or "public accommodation[s]." Colo. Rev. Stat. § 24-34-301(5.3) ("'Place of public accommodation' or 'public accommodation' has the same meaning as set forth in Title III of the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12181(7), and its related amendments and implementing regulations.").

123.    Each CSL plasma collection center is also a "place of public accommodation" as the term is independently defined in Colo. Rev. Stat. § 24-34-601(1). It is a "place offering services, facilities, privileges, advantages, or accommodations to the public." It is also a "public facility of any kind[.]" *Id.*

124.    Like the ADA, Colorado law makes it "a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. § 24-34-601(2)(a).

125.    The CADA is to be construed consistently with the ADA. Colo. Rev. Stat. § 24-34-802(4) ("A court that hears civil suits pursuant to this section shall apply the same standards and defenses that are available under the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations[;]" *see also*

3 Colo. Code Regs. § 708-1:60.1 ("The Law concerning handicap and/or disability is substantially equivalent to Federal law, as set forth in the Americans with Disabilities Act, as amended, and the Fair Housing Act concerning disability.")

126.    Moreover, under Colorado law, an individual with a disability "has the right to be accompanied by a service animal individually trained for that individual" in a public accommodation or any place open to the public. Colo. Rev. Stat. §§ 24-34-803(1)(a), (d). "It is unlawful for any person, firm, corporation, or agent of any person, firm or corporation to: (a) Withhold, deny, deprive, or attempt to withhold, deny, or deprive a[n] . . . individual with a disability who is accompanied by a service animal . . . of any of the rights or privileges secured in section 24-34-803; (b) Threaten to interfere with any of the rights of a[n]     . . . individual with a disability who is accompanied by a service animal . . . secured in section 24-34-803[.]" Colo. Rev. Stat. § 24-34-804(1).

127.    CSL's categorical exclusions have denied, and continue to deny, Individual Plaintiffs and others with disabilities the full enjoyment of its place of public accommodation.

128.    A violation of CADA can be remedied by injunctive relief, "actual monetary damages," or a statutory fine of up to $3,500. Colo. Rev. Stat. § 24-34-802(2)(a).

129.    Individual Plaintiffs have suffered and continue to suffer actual monetary damages as a result of CSL's actions. But for CSL's actions, they would have donated plasma in the two years prior to the filing of this Complaint, and would have received compensation for doing so. They are similarly being deprived every day going forward of an opportunity to donate plasma by CSL's exclusionary policies and practices. Other CCDC members similarly are being deprived of the opportunity to donate plasma every day by CSL's unlawful policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(1)     enter a declaratory judgment finding that the foregoing actions of Defendant violate Title III of the Americans with Disabilities Act and CADA;

(2)     enter a permanent injunction directing Defendant and its agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including updating its Medical Staff Reference to come into compliance with Title III's requirements;

(3)     award damages and fines against Defendant and for the benefit of Individual Plaintiffs to compensate them for CSL's violations of the CADA;

(4)     award Plaintiffs their reasonable attorneys' fees and costs; and

(5)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable as of right.


Respectfully submitted,                              Dated:  May 13, 2020

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
Michael Allen
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
ssamberg-champion@relmanlaw.com
mallen@relmanlaw.com

/s/ Kevin W. Williams
Kevin W. Williams
Andrew C. Montoya
Colorado Cross-Disability Coalition
Civil Rights Legal Program
Empire Park
1385 S. Colorado Blvd., Suite 610-A
Denver, CO 80222
Tel: (720) 336-3584
Fax: (720) 420-1390
kwilliams@ccdconline.org
amontoya@ccdconline.org

/s/ Scott C. LaBarre
LaBarre Law Offices, P.C.
1660 S. Albion St., Suite 918
Denver, CO 80222
Tel. (303) 504-5979
Fax: (303) 758-6150
slabarre@labarrelaw.com

*Attorneys for Plaintiffs*